IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 23, 2003

## MICHAEL ANDERSON PEEK v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 237930     Douglas A. Meyer, Judge**

**No. E2003-00449-CCA-R3-PC**
**November 20, 2003**

A Hamilton County jury convicted the Petitioner, Michael Anderson Peek, of four counts of aggravated rape, one count of attempted aggravated rape, three counts of rape, one count of aggravated robbery, two counts of robbery, and three counts of aggravated burglary. The trial court imposed an effective sentence of ninety-nine years in prison. On direct appeal, this Court affirmed the convictions, and the Tennessee Supreme Court denied the Petitioner's application for permission to appeal. The Petitioner then sought post-conviction relief, alleging that he was denied effective assistance of counsel. Following a hearing on the post-conviction petition, the trial court dismissed the petition, and this appeal ensued. We affirm the trial court's dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Bill Speek, Chattanooga, Tennessee, for the appellant, Michael Anderson Peek.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Renee W. Turner, Assistant Attorney General; William H. Cox, III, District Attorney General; and Rodney C. Strong, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

Our Court summarized the underlying facts of the Petitioner's case on direct appeal as follows:

Victim One

The first victim, T.P., a thirty-one-year-old single mother, testified that she

lived in the Hamilton Point Apartments in the East Brainerd area of Chattanooga with her two young sons. On the morning of Wednesday, January 11, 1995, she had awakened her sons as usual, fed them breakfast, and waited with them for the school bus. At about 8:30 a.m., she returned to her apartment and was completing some paperwork in her bedroom when she heard her front door creak open. She walked toward her bedroom door and saw a man standing in the hallway. He wore a bandana over his face and some type of a hat to cover his hair. With his hand in his jacket pocket, he told her not to scream or he would "put a hole in" her. He told her to take off her glasses and turn around. He then went through her dresser until he found some stockings which he used to blindfold her. From that point on, she could see nothing and testified that she could not visually identify her attacker. She did tell him that her sons needed her and that he could take whatever he wanted if he would promise not to hurt her.

After T.P. was blindfolded, she was told to "disrobe" and sit down on the bed. Her attacker then told her to lay down on the bed where he fondled her and told her how pretty she was. He then penetrated her vaginally with his penis and ejaculated. T.P. also testified that her attacker had asked her to "make love to him like I did my husband." After the rape, he asked if "it was good" for her and said that it "wasn't that good" for him. She chose to say nothing, fearing that if she said the wrong thing, he would kill her. He then went into her closet, took a pair of shoelaces out of her tennis shoes, tied her hands behind her back, and tied her feet. He took money from her purse and from a coin holder on top of the stove. After pulling telephone cords out of the walls, he came back to the bedroom and told her if she wanted to see her sons alive, she would "write this off as a bad experience" and learn to lock her door. He told her that "his boys" were watching her and that if she wanted to see her sons make it home, she would not call the police. Once her attacker had left and she was free, she locked her door and called the police using parts of telephone equipment she could piece together.

T.P.'s testimony was followed by the testimony of three of her neighbors: Patty Shipley, who lived in the apartment diagonally across from the victim; Renee Diane Moton, who lived with her son in the apartment directly across from T.P.; and Sherman Moton, the eleven-year-old son of Moton. Shipley positively identified the defendant as the man she saw outside the apartment building as she was leaving on the morning of January 11, 1995, at approximately 7:15 a.m. The defendant was standing in front of T.P.'s car, "just kind of propped up there." Moton and her son positively identified the defendant as the man each saw standing at the end of the breezeway outside of the victim's apartment on the morning of January 11, 1995, at approximately 8:00 a.m. The defendant was leaning against a fence at the end of the breezeway and "looking out into the woods." In each case, the defendant and the witnesses had spoken, exchanging common greetings.

T.P. was examined by Dr. Bert Geer at the Erlanger Medical Center, according to police protocol for possible rape victims. Dr. Geer collected samples for a rape kit which were turned over to the Chattanooga Police Department for DNA testing. The victim's medical history and assault information form, a twenty-five question, preprinted form, included T.P.'s identification of the race of her assailant as African-American.

T.P. subsequently listened for approximately fifteen minutes to a tape of an interview between the defendant and Detective Bill Phillips of the Chattanooga Police Department under conditions agreed to by the defendant and the State. T.P. positively identified the voice of the defendant as the voice of her attacker.

The State's expert witness, TBI Agent Joe Minor, testified that the vaginal smears taken from T.P.'s rape kit had been tested at the Tennessee Bureau of Investigation's forensic services division in Nashville. The five-probe DNA test resulted in a DNA profile that matched the specimen obtained from the defendant with a probability of selecting an unrelated individual at random with a matching DNA profile–or the odds that someone other than the defendant would have the same DNA profile–being approximately one in 19,000 in the Caucasian population and approximately one in 22,000 in the African American population. According to Agent Minor's testimony, greater than 99.99 percent of the population could be excluded as being the source of the DNA sample taken from T.P.

Based on these facts, the defendant was convicted of three separate felonies: aggravated rape for the vaginal penetration of the victim while leading the victim to reasonably believe that he had a weapon; aggravated robbery for the theft of money while leading the victim to reasonably believe that he had a weapon; and aggravated burglary for entering a habitation and committing a felony. The sentences, all concurrent for this series of acts, were twenty-five years, twelve years, and six years, respectively.

Victim Two

The second victim, K.S., a twenty-three-year-old, also lived at Hamilton Point Apartments but in a different building from T.P. K.S. testified that on December 8, 1995, she was returning home alone from her job at a local restaurant at approximately 2:20 a.m. Because all the parking places in front of her building were taken, she had to park on the side. She locked her car and, carrying her work apron in her hand, walked around to the front of the building when a man emerged from the breezeway. She could tell he was an African American. She was not alarmed, thinking the man was one of her neighbors, until she noticed that he had his face covered. She began to scream as he grabbed her from behind and covered her mouth with his hand. He told her to be quiet or he would hurt her. He steered her over to

the side of the building where four air conditioning units were located behind a latticework fence and bushes.

Once they reached a space in the middle between two units, they stopped. K.S. was able to engage the defendant in a discussion of genital warts, which she claimed to have; of her roommate situation; and of the fact that she was menstruating. She testified that his tone with her was "very conversational, very calm, very deliberate, like not a thing in the world is going wrong here." He finally told her to take off all her clothes and be quiet or he would kill her. He allowed her to remove a tampon and then, taking her shoulders, pushed her over one of the units and penetrated her anally. K.S. testified that after the rape was over, the defendant asked for her money and took what he found in the pocket of her pants.

K.S. sought the help of neighbors who called the police. She was taken to the Rape Crisis Center where a rape kit was processed on her and given to the police. K.S. identified the race of her attacker as African-American on the victim's medical history and assault information form completed at the Rape Crisis Center.

On March 14, 1997, K.S. listened to the same voice exemplar that T.P. had heard. K.S. positively identified the voice of the defendant as the voice of the man who raped her.

The State's expert, Agent Minor, testified that the DNA profile from seminal fluid on the work apron used by the defendant to wipe himself after the rape was tested at the TBI laboratory and matched the defendant's with a probability of selecting an unrelated individual at random being approximately one in 27 billion in the Caucasian population and one in 195 billion in the African-American population.[1]

Based on these facts, the defendant was convicted of rape for the anal penetration of the victim and robbery for the theft of money from the victim's clothing. The sentences, both to be served concurrently, were twelve years and six years respectively. The sentences were ordered to be served consecutively to the twenty-five year sentence for the aggravated rape of T.P. in No. 213109.

Victim Three

The third victim, G.C., a forty-four-year-old woman, testified that she was a resident of Hidden Creek Apartments, a complex in the same neighborhood as the Hamilton Point Apartments where victims one and two lived. G.C. testified that on

---

[1]According to expert testimony, the difference in statistical probability rates for matches with someone other than the defendant among the victims is the result of differing grades of samples taken and therefore differing results as to each of the five DNA probes tested.

Friday, January 26, 1996, at approximately 7:00 p.m., she had parked her car in the apartment lot and was walking toward her building when a man came toward her and then moved behind her and grabbed her, placing his hand over her mouth to prevent her from screaming. He threatened to stab her in the heart, a threat he repeated over the course of the events that followed. He dragged her to the bushes, pushed her down into the mud, and took the money she had in her purse. As she struggled, he dragged and pushed her through dense woods behind the apartment complex.

When they got to a clearing in the woods, the defendant stopped and told G.C. to take off all her clothes. The defendant first made her get on her knees and perform oral sex. Afterwards, he had her cover her eyes with her hands while he pulled his hat over her face so that she could not see. Later, he blindfolded her by tying her turtleneck sweater around her face. He then made her lie down and he penetrated her vaginally, telling her that "[y]ou're supposed to be enjoying this. I mean, act like you're enjoying this. You're supposed to pretend you're enjoying this." The defendant threatened anal rape but did not carry out this threat. Instead, he took laces from G.C.'s boots, tied her hands behind her back, tied her feet in front of her, and left her blindfolded with her own turtleneck.

Once free, G.C. ran into her apartment and called 911. She was taken to the Rape Crisis Center where a rape kit was processed on her and given to the police. She identified her attacker's race as African-American on the victim's medical history and assault information form completed at the Rape Crisis Center.

G.C. was unable to positively identify the voice on the exemplar as that of her assailant. She did testify that in the moments before the defendant grabbed her on the night of January 26, she recognized him as the same man who had passed her on the walkway just nights earlier, similarly bundled up.

Agent Minor testified that the DNA profile from vaginal swabs taken from G.C.'s rape kit were tested at the TBI laboratory and matched the defendant's profile with a probability of selecting an unrelated individual at random being approximately one in 370,000 in the Caucasian population and one in 777,000 in the African-American population.

Rebecca Adams, who lived in the same apartment complex in the unit beside G.C., testified to the following events of January 24, 1996, just two days before the defendant attacked and raped G.C.:

> It was late at night, I'd been working fairly late and it was after eleven o'clock at night. It was dark out and misty. It had been raining a little bit, I think. And I parked and got my mail and I was carrying two bags in my hand walking towards my apartment, which is on the

other side of the parking lot. And as I walked across the parking lot, there was someone standing there in the shadows. It was someone who was wearing a hooded jacket, and, and as I walked towards my apartment complex, that person moved out from behind the shadows and started walking towards me.

And I walked a little bit faster and that person fell in line approaching towards me, walking behind me. And I walked faster and he walked faster, and I could feel that any, within a short amount of time, he was going to be very, very close to me, and I was getting very concerned, and I didn't really know what to do, but I turned around and I said, "Hi, how are you?" And he, he just kind of stumbled. I think I took him a little bit by surprise, and he started–he moved a little bit and continued walking, but moved a little bit out of my direction, and then I just walked up to my apartment as quick as I could.

. . . .

Q. Okay. Do you, would you be able to recognize the person who was behind you when you, who you greeted?

A. Yes.

Q. Can you tell the jury whether or not that person is in the courtroom today?

A. Yes.

Q. And for purposes of the record and for the jury, could you identify who that person is?

A. The person in the blue shirt over there holding his hand up.

Based on these facts, the defendant was convicted of rape for sexually penetrating the victim by fellatio; rape for the vaginal penetration of the victim; and robbery for the theft of money from her purse. The sentences, all to be served concurrently, were twelve years, twelve years, and six years respectively. The sentences were ordered to be served consecutively to the twelve-year sentence for the rape of K.S. in No. 213111.

Victim Four

The fourth victim, K.T., a twenty-five-year-old single mother of two children, ages three and one, testified that on July 1, 1996, she was living in the downstairs apartment of a duplex she shared with her sister, who lived in the upstairs apartment. The duplex is in the East Lake area of Chattanooga. On this night, K.T. had put her children to sleep on the couch and made a pallet for herself beside them on the floor because it was hot and her apartment had no air conditioning. At some point during the night, she woke up because someone was dragging her through the apartment. He had his hands over her nose and mouth.

K.T. testified that she started fighting and struggling against her attacker until he slammed her against a wall, telling her to stop fighting, and placed a knife to her throat. When she saw her three-year-old daughter in front of her, screaming and crying, she stopped fighting. Her attacker told her to send her daughter back to bed in the living room, and she complied. He then blindfolded her with one of her tee shirts and told her to take her clothes off. She was wearing a tee shirt and shorts and removed her shorts. Her attacker told her, "I hear you do it good, you better, because your life depends on it." He then forced her to perform oral sex on him in her bedroom. He led her back into the hallway, telling her to get down on the floor on her knees, and attempted to have anal sex with her. Instead he penetrated her vaginally, threatening to cut her throat if anyone showed up. Finally, he took her back into her bedroom where he tied her hands behind her back and then tied her feet to her hands, using a vacuum cleaner cord he had cut before the attack started, and leaving her lying on her stomach on her bed, blindfolded. Once he was gone, her three- year-old daughter came and took the blindfold off her mother and untied her hands and feet.

K.T.'s sister called the police, and the victim was taken to the Rape Crisis Center. A rape kit was processed on her and turned over to the police. K.T. identified her attacker as an African American male on the victim's medical history and assault information form completed at the Rape Crisis Center.

Agent Minor testified that the vaginal slide and swabs from K.T.'s rape kit were tested at the TBI laboratory and matched the defendant's DNA profile with a probability of selecting an unrelated individual at random with a matching DNA profile–or the odds that someone other than the defendant would have the same DNA profile–being one in 50 million in the Caucasian population and one in 145 million in the African-American population.

K.T. also listened to the voice exemplar of the defendant for approximately fifteen minutes. She made a positive identification of the voice of the defendant as that of the man who raped her on July 1, 1996.

On cross-examination, K.T. testified that a few days prior to the attack, the defendant had driven by the duplex she shared with her sister on his motorcycle and spoken to the two sisters while they were sitting on the porch at approximately 11:00 p.m. He did not get off his motorcycle but commented that he had seen them from the gas station across the street and wanted to stop and say hello since he had not seen them for a number of years. K.T. testified that she recognized the defendant as someone she had known slightly some thirteen years earlier when the defendant was dating a woman who lived above her.

The events of July 1, 1996, led to four separate convictions: aggravated rape

for the vaginal penetration of the victim while leading the victim to reasonably believe that her attacker had a knife; aggravated rape for the oral penetration of the victim while leading the victim to reasonably believe that her attacker had a knife; attempted aggravated rape for the attempted anal rape of the victim; and aggravated burglary for entering a habitation and committing a felony. The sentences for this series of acts were twenty-five years, twenty-five years, twelve years, and six years respectively. The sentences were ordered concurrent with each other, but the two sentences for aggravated rape and the sentence for attempted aggravated rape were ordered consecutive to the twelve-year sentence for the rape of G.C. in No. 213113.

Victim Five

The fifth victim, G.H., a fifty-one-year-old woman, testified that she lived in her own home also in the East Lake area of Chattanooga. G.H. testified further that she had gone to bed on a pallet in her living room because the air conditioning in her house was not working. When her alarm clock went off at 4:00 a.m. on July 30, 1996, she hit the snooze button and lay back down. Just as she was about to get up, she felt something touch her back. Then someone pushed her back down on her stomach and held something sharp to her neck, threatening to kill her if she did not remain quiet. The attacker blindfolded her with one of her shirts, rolled her over, and told her what he was going to do. G.H. testified to the following:

Q. What did he tell you he was going to do?
A. That he was going to have sex, but he was, you know, used vulgar language, so–
Q. Okay. So he–if you don't mind telling the jury, just tell them specifically what he said?
A. He told me he was going to fuck me like I'd never been fucked before.
Q. Okay.
A. And so then he proceeded to have sex and then he rolled me back over. He asked me–he told me he needed $50. I told him I didn't have any money. And he said he was going to kill me if I didn't give him money. I said, "Well, I don't have any money." So then he tied my hands behind my back and tied my feet, and I just laid there, because he left, I guess, and, you know–
Q. What were you thinking at that time?
A. That he was going to kill me.
Q. And how did he tie you? What did he use to tie you and how did he tie your arms?
A. My shoe strings.

G.H. testified that her attacker warned her not to call the police. Once she had freed herself, G.H. went next door where neighbors let her in and called her son who came and placed a 911 call to the police.

G.H. was taken to the Rape Crisis Center where a rape kit was processed and given to the police. She was unable to identify the race of her attacker on the victim's medical history and assault information form completed at the Rape Crisis Center. The victim was also unable to positively identify the voice of the defendant on the exemplar as that of her attacker because her attacker whispered. She did note that her attacker had a slight Northern or "proper" accent.

The State's expert witness, Agent Minor, testified that the vaginal swab from G.H.'s rape kit matched the DNA of the defendant with a probability of selecting an unrelated individual at random having a matching DNA profile being approximately one in 276 billion in the Caucasian population and one in 195 billion in the African-American population.

Timothy Daniel Knight testified that he was living with his grandmother in the house next door to the victim at the time of the attack. Knight testified further that in the early morning hours of July 30, 1996, he had gone to a gas station and bought beer. When he came out, he saw the defendant, a man whom he had met a couple of years before through mutual friends, standing in the parking lot of the gas station. The defendant asked Knight for a cigarette; Knight gave him the cigarette and then drove home.

Because his grandmother did not allow beer in her house, Knight sat in his car to drink and listen to the car radio. Knight testified he saw the defendant walking down the street and called him to come over and join him in the car for a beer. The time was approximately 2:00 a.m.

The defendant joined Knight in the car. They talked, listened to music, and drank beer for about forty-five minutes. Finally, Knight told the defendant that it was getting late and he had to get up and go to work soon, so Knight went inside his grandmother's house. At that point, it was about 3:15 a.m. Knight did not see where the defendant went.

Based on these facts, the defendant was convicted of aggravated rape for the vaginal penetration of the victim while leading the victim to reasonably believe he had a weapon and aggravated burglary for entering a habitation and committing a felony. The sentences, both to be served concurrently, were twenty-five years and six years, respectively. The twenty-five year sentence was ordered to be served consecutively to the rape sentence for victim four in No. 213117.

State v. Peek, No. E1998-00038-CCA-R3-CD, 2000 WL 565129, at *2-9 (Tenn. Crim. App., at Knoxville, May 3, 2000), *perm. app. denied* (Nov. 13, 2000).

A Hamilton County jury convicted the Petitioner of four counts of aggravated rape, one count

of attempted aggravated rape, three counts of rape, one count of aggravated robbery, two counts of robbery, and three counts of aggravated burglary on April 4, 1997, and the trial court imposed an effective sentence of ninety-nine years in prison. This Court affirmed the conviction on direct appeal, and the Tennessee Supreme Court denied the Petitioner's application for permission to appeal. On September 18, 2001, the Petitioner filed a pro se post-conviction petition. On October 8, 2001, the post-conviction court appointed Bill Speek to represent the Petitioner in this post-conviction matter. Speek filed an amended petition for post-conviction relief on January 17, 2002. In his petition, the Petitioner asserted that he should be granted post-conviction relief based upon ineffective assistance of counsel. The post-conviction court conducted a hearing on the amended petition on February 3, 2003, and entered an order dismissing the petition on February 26, 2003. The Petitioner filed a timely notice of appeal.

The following evidence was presented at the post-conviction hearing: The Petitioner testified that Bill Dobson ("Counsel") and Rich Heinsman ("Co-Counsel"), who both worked for the public defender's office, represented him at his trial. He stated that about a week before trial, he met once with both Counsel and Co-Counsel and once with just Counsel. The Petitioner explained that at the meetings, which lasted approximately forty-five minutes, "[t]hey discussed that the DNA was the strength of the case, the strongest part of the case, and I kept asking them, 'Has the DNA come back yet?'" He stated that Counsel visited him two days before trial and told him that the DNA results came back from the lab. The Petitioner explained that he discussed the DNA evidence with his attorneys, and "they told me that they didn't know much about DNA, . . . so I was wondering if they was going to get an expert for him to do the test, . . . on my behalf. I wanted them to have a DNA expert to do another test besides the one the State did." The Petitioner stated that he asked both Counsel and Co-Counsel for a DNA expert to testify at his trial. He stated that Counsel told him, "we'll see what we can do," and Co-Counsel told the Petitioner that he was going to read a book on DNA so he could cross-examine the State's expert witness. The Petitioner stated that Co-Counsel cross-examined the DNA expert at trial. He stated that neither Counsel nor Co-Counsel obtained a DNA expert to testify at his trial. The Petitioner explained that he asked Counsel if they could get a continuance so they could obtain an expert, but Counsel told him to be quiet and that he would take care of it. He testified that Counsel did not obtain a continuance for the purpose of obtaining an expert.

The Petitioner further testified that neither Counsel nor Co-Counsel explained the elements of the various crimes to him before trial. He explained, "They . . . didn't tell me really nothing. I mean, I was in the dark for a long time. . . . My attorneys, I feel like they didn't do nothing. . . . They just rushed right into it and . . . thought it was going to be a cakewalk, . . . but they wasn't prepared for trial." On cross-examination, the Petitioner admitted that Co-Counsel vigorously cross-examined the State's DNA expert at his trial. He also admitted that he was convicted in federal court on two rape counts in Georgia.

Karla Gothard, executive assistant district public defender, testified that she supervised Counsel while he was at the public defender's office. Gothard stated that she reviewed the Petitioner's file from the public defender's office and noticed that "[t]here's very, very little

documentation in this file." She explained that this lack of documentation was due to Counsel's blindness "because obviously a blind man isn't writing notes." Gothard testified that Counsel did not record when he met with the Petitioner or make many notes about he case in the Petitioner's file. She explained, "[t]his is a very large file and there are lots of motions and affidavits that have been prepared in it, and there's no documentation to show when that was done or what work was done on it." She stated that Counsel documented one visit with the Petitioner.

On cross-examination, Gothard testified that Counsel filed a motion requesting a DNA expert, and the trial court granted that motion on January 27, 1997. She testified that the trial court appointed Dr. William Shields as a DNA specialist to assist in the preparation of the Petitioner's defense. Gothard explained, "[Dr.] Shields is one of the foremost DNA experts in the country as far as I'm concerned. He's out of New York." Gothard testified that Dr. Shields "reviewed all of the testing that was done." She explained that Dr. Shields examined the reports and "lab notes" from the Tennessee Bureau of Investigation ("TBI") regarding the Petitioner's DNA testing, as well as the TBI's procedure manual for DNA analysis. Gothard testified, "So I know that [Dr.] Shields has consulted in this case. He would not actually do testing unless he indicated to us or we had some reasonable basis for coming to the judge and saying, 'retesting.'" She explained:

> Anytime we request the services for an indigent defendant, we have to make a showing to the Court that it's reasonable and necessary to the defense. And so it's . . . not just you go in and ask for an expert and get it, or you go in and ask for testing and get it; you have to go in and make a showing and you have to have a good foundation for that. Normally the foundation would be to have one expert look at it, review what's been done and to say whether they felt that testing would be justified or not. If we don't have that, then we really can't go forward in making a request for testing.

Gothard testified that she could not find any letters or reports in the Petitioner's file regarding Dr. Shields's examination of the Petitioner's DNA testing from the TBI lab.

Co-Counsel testified that he had been a defense attorney since October of 1993. He stated that he worked as a public defender in Hamilton County for three years, and during that time he assisted Counsel with the Petitioner's trial. Co-Counsel testified that he would occasionally sit with Counsel at trial to be "an extra pair of eyes for him." Co-Counsel explained that Counsel asked him to help with the Petitioner's case because of "the DNA, a lot of it was visual, reading the autorads, and also I had kind of a science background." Co-Counsel stated that he and Counsel met with the Petitioner at least once prior to trial, but he could not remember the discussion they had with the Petitioner at that meeting.

Co-Counsel explained that his responsibilities in the Petitioner's trial were limited to the DNA aspect of the case. He testified that he prepared for the Petitioner's trial by studying "two bibles of DNA" published by the National Research Counsel and consulting with Dr. Shields before the trial. He explained that "even with the books I sort of got stuck on a few issues, and [Dr.

Shields] was able to get me over the hump." Co-Counsel testified that Dr. Shields came to Chattanooga on the day before the trial because he was a potential witness in the case. Co-Counsel explained that he and Counsel decided not to call Dr. Shields as a witness because "it wouldn't have been useful to us. . . . [A]fter looking at the autorads and reviewing what evidence we were able to provide to [Dr. Shields], we just thought it would be better, we would be more successful cross-examining their witness than using our own in rebuttal." Co-Counsel explained that Dr. Shields would have bolstered the findings of the State's DNA expert if he had testified, because Dr. Shields did not discover any irregularities or errors in the findings of the State's DNA expert. Co-Counsel testified that Dr. Shields found that the State's DNA expert correctly analyzed the Petitioner's DNA.

Co-Counsel testified that he vigorously cross-examined the State's DNA expert regarding his qualifications and his findings. Co-Counsel explained:

> I made a . . . mask out of basically construction paper and asked [the State's DNA expert] to read the autorads on the stand. This way it sort of hid other markers that could have told him where he was reading, and it would have been easy for him to do if he just had the whole autorad, but with the mask where he could only read one band at a time, I thought I might be able to catch him, if not interpreting it wrongly, at least off guard.

He stated that he used everything he could to attack the State's DNA analysis. Co-Counsel testified that he did not remember having a personality conflict with the Petitioner during the trial, and he did not remember the Petitioner complaining to him during the trial about the way the case was being handled.

On cross-examination, Co-Counsel testified that he was not involved in determining which witnesses to call during the trial, rather he was only in charge of the DNA aspect of the case. Co-counsel explained that the Petitioner's trial was his first experience in dealing with DNA in a trial setting. He stated that he could not remember how many telephone calls he had with Dr. Shields before the trial started, though he specifically remembered one telephone conversation. Co-Counsel testified that he and Counsel decided not to retest the Petitioner's blood, because Dr. Shields recommended that they not do any retesting in the Petitioner's case. Co-Counsel explained that they decided the night before trial not to have Dr. Shields testify. He stated that the public defender's office did not have a policy which required public defenders to keep copies of correspondence with experts.

The post-conviction court made the following findings in its memorandum dismissing the Petitioner's petition:

> The petitioner alleges that his trial counsel did not seek independent DNA analysis. The defense expert on DNA analysis, William Shields, Ph.D, reviewed the state's DNA analysis and apparently concluded that it was valid and that independent analysis was unnecessary. He helped [Co-Counsel], who cross-examined the state's

DNA expert, agent Joe Minor of the Tennessee Bureau of Investigation, and addressed DNA issues in the petitioner's closing argument, prepare for trial, and he was present in court when Mr. Minor testified. He was not called to testify because his testimony would not have been favorable to the petitioner. The Court finds no deficiency in counsel's performance in this respect.

## II. Analysis

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203 (1997). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a defendant to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness" and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and

"should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

The Petitioner contends on appeal that "counsel's failure to procure an expert to refute the State's expert on DNA evidence constituted ineffective assistance of counsel. . . ." At the post-conviction hearing, the Petitioner raised several grounds regarding whether Counsel and Co-Counsel provided the Petitioner with effective assistance during his trial.[2] Because the Petitioner failed to raise the other issues relating to his ineffective assistance of counsel claim in his appellate brief, the Petitioner has waived those issues. Tenn. R. App. P. 13(b); Nichols v. State, 90 S.W.3d 576, 607 (Tenn. 2002).

During the post-conviction hearing, both Gothard and Co-Counsel testified that Counsel filed a motion requesting a DNA expert for the Petitioner and obtained the services of Dr. Shields. Co-Counsel testified that Dr. Shields reviewed the State's DNA analysis and concluded that the analysis contained no errors or irregularities. Co-Counsel stated that because Dr. Shields found no errors in the State's DNA analysis, he and Counsel did not file a motion with the trial court to have the samples retested in another lab. Co-Counsel explained that he and Counsel decided that they would not call Dr. Shields to testify because he would not help the Petitioner's case. Co-Counsel stated that he met with Dr. Shields the day before the Petitioner's trial in order to decide whether the expert would testify and to prepare to cross-examine the State's DNA expert. Co-Counsel also testified that he studied two DNA treatises to prepare to cross-examine the State's DNA expert. Moreover, Co-Counsel stated that he vigorously cross-examined the State's DNA expert regarding his qualifications and his analysis of the Petitioner's DNA and the samples obtained from the victims.

After thoroughly reviewing the evidence from the post-conviction hearing, we conclude that both Counsel's performance and Co-Counsel's performance in defending the Petitioner "fall[] within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Furthermore, the Petitioner failed to prove that either Counsel's performance or Co-Counsel's performance prejudiced his defense, resulting in a failure to produce a reliable result. Strickland, 466 U.S. at 687; Cooper, 849 S.W.2d at 747. Indeed, contrary to the Petitioner's assertions, the evidence showed that Counsel and Co-Counsel procured a highly qualified DNA expert to review the State's DNA analysis and help prepare for the cross-examination of the State's DNA expert. Therefore, we conclude that the Petitioner has failed to prove ineffective assistance of counsel by clear and convincing evidence, and the post-conviction court did not err by finding that the Petitioner received effective assistance of counsel and dismissing his petition.

---

[2]In addition to his allegation that Counsel failed to procure a DNA expert, the Petitioner contended that he was denied effective assistance of counsel because of the following: Counsel did not explain the charges to him; Counsel did not fully investigate the facts or interview potential witnesses; Counsel did not move for a continuance to procure an expert; Counsel did not effectively cross-examine witnesses; and Counsel did not call a potential alibi witness.

### III. Conclusion

In accordance with the forgoing authorities and reasoning, we AFFIRM the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE